UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCUS LAMAR KITCHEN,

        Petitioner,

                                        CASE NO. 2:16-cv-13161

v.

                                        PAUL D. BORMAN

JOSEPH BARNETT,                UNITED STATES DISTRICT
                                        JUDGE

        Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner Marcus Lamar Kitchen has filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's second conviction for possession of a firearm during the commission of, or attempt to commit, a felony ("felony firearm"). *See* Mich. Comp. Laws § 750.227b. The sole ground for relief is that Petitioner's guilty plea was involuntary and unknowing due to his trial attorney's ineffective assistance. Because the state courts' adjudications of this issue were objectively reasonable, the Court will deny the petition.

# I. Background

## A. The Charges and Preliminary Examination

Petitioner was charged with one count of felon in possession of a firearm, one count of carrying a concealed weapon, and one count of felony firearm, second offense. The conviction arose from an incident at a house on Dwyer Street in Detroit, Michigan. At Petitioner's preliminary examination in state district court, police officer Lamar Penn testified that, on October 11, 2013, he was looking for a different person when he noticed Petitioner emerge from a house at 19660 Dwyer Street. A car then pulled up to the house, and Petitioner got into an argument with the passenger of the car. The passenger made a gesture with his hand as if he were going to shoot Petitioner. The car sped away as Petitioner backed up, and Petitioner then walked up to the house at 19660 Dwyer Street and knocked on the door. An arm and hand emerged from the front door of the house and handed a gun to Petitioner who placed the gun in the back pocket of his pants. Officer Penn contacted some other officers who arrived on the scene in less than two minutes. (10/24/13 Prelim. Examination Tr., at 13-19.)

Officer James Napier testified that, on October 11, 2013, he was a member of a team that was looking for someone with an active warrant. He responded to 19660 Dwyer Street at Officer Penn's request and noticed Petitioner standing alone outside the house at that address. He patted down Petitioner because Officer Penn

had said that a person matching Petitioner's description was armed. Napier could feel a small-caliber handgun in Petitioner's back pocket. He confiscated the gun because Petitioner did not have a license to carry the weapon. He also handcuffed Petitioner and then went inside the house where he recovered a shotgun and a handgun from the front room of the house. *Id.* at 6-12.

### B. Petitioner's Cooperation with the Police, his Plea, and his Sentence

Petitioner was arrested during the incident on Dwyer Street, but his trial date in Wayne County Circuit Court was adjourned four times while he cooperated with law enforcement officials on an unrelated homicide case. After he failed a polygraph test that was conducted during the homicide investigation, the Wayne County prosecutor's office declined to offer Petitioner any consideration for the information that he had provided in the homicide case. The trial prosecutor also declined to dismiss and re-file the felony-firearm case to give Petitioner more time to prepare for trial.

On May 21, 2014, Petitioner pleaded guilty to one count of felony firearm, second offense. In return, the trial prosecutor dismissed the other two firearm charges and a notice charging Petitioner with being a habitual offender, third offense. On June 5, 2014, the trial court sentenced Petitioner to a mandatory term of five years in prison.

### C. The Motion to Withdraw the Plea and the Evidentiary Hearing

Petitioner moved to withdraw his guilty plea on the ground that his plea was involuntary because he did not have a meaningful choice between going to trial with witnesses and pleading guilty. He claimed that trial counsel was ineffective for failing to investigate witnesses and for advising him to accept a plea offer without conducting a reasonable investigation. The trial court held an evidentiary hearing on Petitioner's motion over the course of three days.

#### 1. Trial Counsel

Petitioner's trial attorney, Samuel Churikian, testified that Petitioner's mother retained him after Petitioner's preliminary examination. During one of his visits to the county jail, Petitioner informed him that he had information regarding a high-profile homicide in Detroit and that he was interested in knowing whether the prosecution would consider a plea bargain in return for his help with the homicide case. Churikian subsequently approached Robert Stevens, the person in charge of Wayne County's homicide unit. The two of them discussed the possibility of Petitioner receiving some benefit for providing information leading to an arrest in the homicide case. There was an unwritten agreement that Petitioner would receive a benefit, but any plea offer was dependent on Petitioner passing a polygraph test, and the nature of the benefit was not specified. Some of the options

they considered were dismissal of the felony firearm charge, a guilty plea to a lesser offense, and a sentence served in the county jail. According to Churikian, an informal negotiation and understanding of this sort was typical of the way things were usually done. (4/20/15 Post-Conviction Hr'g Tr. at 8-12.)

Churikian explained during his testimony that Petitioner's trial date was adjourned several times during the ongoing investigation in the homicide case, and after the fourth adjournment, the trial court said that there would be no further adjournments. Stevens, however, informed the trial judge that, if the police department needed more time to investigate the homicide case, the prosecution would dismiss Petitioner's case and then reinstate the charges to avoid any time concerns. Churikian relied on that assurance. *Id*. at 12-13.

Continuing, Churikian testified that the police officer in charge of the homicide case informed him that Petitioner's information checked out, but shortly before trial, Stevens informed Churikian that Petitioner had flunked the polygraph examination. The matter was then turned over to the trial prosecutor who opposed any further adjournments of the trial date and refused to dismiss Petitioner's case without prejudice. *Id*. at 13-16.

On May 19, 2014, Churikian filed a witness list with the names of three people whom Petitioner had mentioned to him. On the same day, Churikian discussed Petitioner's options with him, as his trial was scheduled for May 21,

2014.  He did not tell Petitioner that his witnesses were unavailable.  In fact, the

witnesses were not hostile, and Churikian expected them to be available.  If they

did not show up for trial, he would have asked the trial court for help in bringing

the witnesses to court.  Although the plea bargain was like the one Petitioner had

rejected before Churikian was retained, Petitioner decided to plead guilty.  *Id*. at

16-25.

### 2.  The Officer in Charge of the Homicide Case

Detrick Mott was the police officer working on the unrelated homicide case.

He testified at the evidentiary hearing that Petitioner provided him with the names

of the perpetrators in the homicide case.  The information was based on what

someone else had told Petitioner.  Although the polygraph examiner determined

that Petitioner was not being truthful during the polygraph examination, Mott

thought that the information which Petitioner had provided was credible, valuable,

and consistent with information that he already had.  Mott vaguely remembered a

conversation about the possibility of dismissing Petitioner's case and refiling it if

the information proved to be unhelpful.  *Id*. at 26-36.

### 3.  The Prosecutor in the Homicide Case

Assistant prosecuting attorney Robert Stevens testified at the evidentiary

hearing that he learned about the information Petitioner had through Petitioner's

trial attorney.  Officer Mott subsequently interviewed Petitioner and took a

statement from Petitioner, but Petitioner failed miserably when he took a polygraph test. Stevens notified Petitioner's trial attorney about the test results and explained to the attorney that there would be no deal. *Id*. at 38-41.

Stevens denied telling the trial court or Petitioner's attorney that the prosecution would dismiss the charges against Petitioner and reinstate the charges if the prosecution decided not to offer Petitioner some benefit for the information he provided. The information that Petitioner had provided involved hearsay, and Stevens thought that Petitioner was trying to use the information to sweeten a deal in a case with a five-year mandatory sentence. He stated that, although they could have been discussing the information before the preliminary examination, Petitioner did not provide the information until later. *Id*. at 42-57.

### 4. Trial Counsel Recalled

Churikian was recalled and then reiterated some of his previous testimony. He also explained that, if necessary, he could have gone to trial. Although it would have been helpful to have had more time with Petitioner's witnesses, he was confident that the witnesses would appear for trial because they were not hostile witnesses and the trial court could have provided assistance if the witnesses failed to appear at trial. He assured Petitioner that the witnesses would be available if Petitioner wanted to go to trial, but he also told Petitioner that it would be his witnesses against the police witnesses. He discussed Petitioner's options with him

before trial and compared the plea offer with the sentence that Petitioner would have to serve if he went to trial and was convicted. Petitioner chose to accept the plea offer, knowing that he would have a defense to the charges. (5/5/15 Post-Conviction Hr'g Tr. at 5-17.)

Churikian opined that there would have been no real prejudice in having to try the case on short notice because three witnesses would have testified for the defense, and they seemed credible. They would have said that the police were lying about that they said they saw and that Petitioner did not have a gun on the day in question. *Id*. at 7-8, 11. When Churikian repeated that Stevens had offered to dismiss the case and reinstate the charges to give the defense more time to prepare for trial, the trial court recalled that Stevens had made that statement at a side bar. *Id*. at 8.

### 5. Ammer Smith

Ammer Smith testified at the hearing that she and her husband Lantz Smith went to 19660 Dwyer Street on October 11, 2013, because Lantz wanted to speak with a friend who was present at that address. She stayed in the car while Lantz went inside the house. Petitioner was standing on the walkway leading to the porch of the house. The police arrived and searched Petitioner, but they did not find anything on him, and she did not see a gun during the incident. She did see the police lead Petitioner to the house after the search, and she learned later that

Petitioner had been arrested, but Petitioner's trial attorney never contacted her. She would have been willing to testify at Petitioner's trial, even though she and Petitioner were not friends and she no prior relationship with him. *Id*. at 30-47.

### 6. Lantz Smith

Lantz Smith testified that he and his wife Ammer went to 19660 Dwyer Street on October 11, 2013, to visit his friend Ernest Johnson. He spoke briefly to Petitioner who was standing in front of the house before he (Lantz) went inside the house. Petitioner was still there when he exited the house. After he got in his car, the police arrived and patted down Petitioner. He did not see a gun or notice the police take anything from Petitioner during the search. He later learned from Petitioner's uncle that Petitioner had been arrested. He and Petitioner's mother went to see Petitioner's attorney, and he told the attorney what he had seen. He also provided the attorney with contact information for himself and his wife, but he never heard from the attorney again, although he would have been willing to testify for Petitioner at trial. *Id*. at 51-64.

### 7. Petitioner Marcus Lamar Kitchen

Petitioner was the final witness at the evidentiary hearing. He testified that he went to 19660 Dwyer Street on October 11, 2013, to pick up his daughter. He was not carrying a gun and no one passed him a gun through the door of the house. He was standing in front of the house when Lantz Smith and Lantz's wife arrived.

The police came after Lantz got in his car. Two police officers searched him, but they did not find anything. They forced him inside the house where Ernest Johnson, Derrick Johnson, and Amber Harper were seated on the floor and his daughter was watching cartoons. Officer Napier went to the back of the house and returned with three guns. Napier asked who owned the gun, and when no one responded, Napier asked if anybody was on probation or parole. Petitioner responded that he was on parole, and the officer then said that the guns were going on him. Then they took him to a facility on Mound Road. (5/11/15 Post-Conviction Hr'g Tr. at 4-10.)

Petitioner went on to say that he was offered a five-year sentence early in the case, but that he retained Churikian after the preliminary examination and planned to go to trial. At some point, he told Churikian that he had information about a homicide case. At the time, it did not seem like his case was progressing, and he thought that he might receive some benefit in exchange for the information. Churikian had said that he would try to get county time for him and, if all else failed, the prosecution would reissue the warrant and give him time to prepare for trial. *Id*. at 11-13.

He provided Officer Mott with information in February, and he spoke with Churikian about the failed polygraph test a day or two before trial. Churikian informed him that he had failed the test, that Stevens was not planning to do

anything for him or reissue the warrant, and that it would be his word against the police officers' testimony if he went to trial. Churikian had not investigated the case or done any of the things he asked him to do. He felt forced to accept the plea offer because he thought that he would be going to trial without any witnesses or a defense and that it would be his word against the officers' testimony. He also anticipated a longer sentence if he went to trial. *Id*. at 14-17.

Petitioner testified that he lied at the plea proceeding when he said that he had a gun in his pocket and that no one had promised him anything or threatened him to make him plead guilty. He thought that if he told the truth, he would have to go to trial and face the possibility of losing. He would have gone to trial if Churikian had investigated and talked to his witnesses, and he did not recall Churikian telling him that it would be possible to have the witnesses at trial. *Id*. at 18-21.

### 8. The Trial Court's Decision

At the close of the evidentiary hearing, the trial court denied Petitioner's motion to withdraw his plea for all the reasons it gave on the record at various times during the hearing. In weighing the strengths and weaknesses of Petitioner's case, the court stated that the Smiths' testimony was a little implausible, but that Napier and Penn's testimony also was somewhat implausible, and that the Smiths' testimony would have created a question of fact for the jury to decide. The court

did not think that defense counsel would have gained much if he had interviewed the police officers or the two men who were present in the house. The court also thought that Petitioner would have subjected himself to damaging impeachment if he had testified. At least one of Petitioner's prior convictions was admissible in evidence, and the prosecutor could have argued that Petitioner had a motive for lying because he was on parole at the time of the crime. The court pointed out that the sentence would not have been much different if Petitioner had gone to trial and been convicted. In the end, however, the court expressed the opinion that Petitioner's desire to go to trial was not based on anything that he did not know when he pleaded guilty. *Id*. at 45-46, 52, 54, 69.

### D. The Direct Appeal, Habeas Petition, and Responsive Pleading

Petitioner appealed the trial court's decision to the Michigan Court of Appeals, but the Court of Appeals denied leave to appeal for lack of merit in the grounds presented. *See People v. Kitchen*, No. 327659 (Mich. Ct. App. Aug. 21, 2015). On March 8, 2016, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the questions presented to it. *See People v. Kitchen*, 499 Mich. 871 (2016).

Petitioner filed his habeas corpus petition through counsel on August 31, 2016. His sole ground for relief is that his guilty plea was not knowing or voluntary because his attorney failed to investigate the case and advised him to

plead guilty under coercive circumstances and without first conducting an adequate investigation. The State argues in an answer to the petition that Petitioner is not entitled to relief because the state court's decision on Petitioner's claim was not contrary to federal law, an unreasonable application of federal law, or an unreasonable application of the facts.

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (quoting 28 U.S.C. § 2254(d)). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the

doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

### III. Analysis

As noted above, Petitioner asserts that his guilty plea was not knowing or voluntary because his trial attorney did not conduct an adequate investigation and was not prepared for trial. As a result of the allegedly inadequate investigation, Petitioner maintains that his attorney should not have counseled him on whether to accept or reject the plea offer. Petitioner also contends that the circumstances surrounding the plea were coercive because the trial court had said there would be no more adjournments in the trial date and his trial attorney had not investigated or prepared for trial. Petitioner concludes that defense counsel's incompetent advice rendered his decision on the plea offer uniformed and involuntary.

## A.  The Guilty Plea

Petitioner seeks to be relieved "of the unconstitutional restraint on his liberty," Pet., Dkt. #1, p. 4, Pg ID 4, but there is no absolute right to withdraw a guilty plea. *United States v. Martin*, 668 F.3d 787, 794 (6th Cir. 2012); *Shanks v. Wolfenbarger*, 387 F. Supp. 2d 740, 748 (E.D. Mich. 2005).  Although Petitioner maintains that due process requires plea withdrawal, *see* Mem. of Law in Support of Pet., at 23, Dkt. #1, p. 31, Pg ID 31, a guilty plea is constitutionally valid if it is voluntary and intelligent.  *Bousley v. United States*, 523 U.S. 614, 618 (1988) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).  A plea is voluntary if the accused has notice of the charges against him and understands both the charges and the constitutional protections that he is waiving by pleading guilty.  *Henderson v. Morgan*, 426 U.S. 637, 645, n. 13 (1976).  A plea is knowing and intelligent if it is done "with sufficient awareness of the relevant circumstances and likely consequences," *Brady,* 397 U.S. at 748, including the maximum and minimum sentences that may be imposed.  *Martin*, 668 F.3d at 792.

Petitioner indicated at his plea proceeding that he wanted to plead guilty to felony firearm, second offense, and that he understood "[e]verything else [would be] dismissed."  (5/21/14 Plea Tr. at 5.)  He also claimed to understand that his sentence would be five years, that he would have to serve the five-year term after any sentence imposed for violating the conditions of parole, and that he would

receive no jail credit on the felony-firearm sentence.  *Id*. at 5-6.   He stated that he and his attorney had discussed the rights that he was waiving by pleading guilty and that he understood those rights.  *Id*. at 6-7.  He also assured the trial court that he was pleading guilty freely and voluntarily, *id*. at 7, and he admitted that he had a gun in his pocket on the day in question even though he had a prior felony conviction that made it illegal for him to possess the gun.  *Id*. at 7-8.  His "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

## B.  Ineffective Assistance of Counsel

The specific basis for Petitioner's claim that his plea was involuntary and unknowing is that his trial attorney failed to properly investigate the facts and advised him to plead guilty under coercive circumstances.

### 1.  Clearly Established Federal Law

To prevail on his claim, Petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Defense attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id*.  at 691.  The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence," *Towns v. Smith*, 395 F.3d 251,

258 (6th Cir. 2005), but "counsel may exercise his professional judgment with respect to the viability of certain defenses and evidentiary matters without running afoul of the Sixth Amendment." *Lewis v. Alexander*, 11 F.3d 1349, 1353–54 (6th Cir. 1993).

Moreover, "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

When a defendant pleads guilty on the advice of counsel, the voluntariness of his plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985). The "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id*. at 59. The defendant must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Id*.

## 2. Application

To his credit, Petitioner's trial attorney attempted to obtain a favorable plea bargain, which could have included a reduced sentence. He did not conduct a thorough investigation of all of Petitioner's proposed witnesses, and he may have relied too much on Stevens' unwritten promise to "dismiss and reissue" if no plea offer was made. However, he did interview Lantz Smith, and he knew what the three witnesses listed on the witness list were expected to say. He also had reasons to believe that the witnesses would appear at trial.

Defense counsel had at least thirty-five years of experience in trying criminal cases, and he stated that he could have gone to trial if he had been required to do so. It was not a complex case, and he had prior adversarial experience with the officers involved in the case. Furthermore, the evidence against Petitioner was substantial, and the sentence could have been longer if Petitioner had gone to trial and been convicted as charged.

The Court concludes that defense counsel's performance did not fall below an objective standard of reasonableness. Any advice to Petitioner to plead guilty was not outside the range of competence demanded of attorneys in criminal cases, given the strength of the evidence against Petitioner and the possibility that Petitioner would receive a longer sentence if he were convicted after a trial.

Petitioner also has failed to show that counsel's performance affected the outcome of the plea process. Before making his decision, he was advised of his options, he knew that Churikian had interviewed Lantz Smith, and he knew that he would have witnesses available for his defense. It appears from the record that he weighed his options and then freely and voluntarily chose to plead guilty, knowing that the prosecution was no longer interested in using him as a witness in the homicide case and that his sentence could be longer than five years if he went to trial and was convicted.

Although Petitioner testified at the evidentiary hearing that he felt pressured to plead guilty, he informed the trial court under oath at his plea proceeding that his plea was voluntary and that no one had threatened him or twisted his arm to make him plead guilty. He also stated that he understood the plea agreement, the mandatory sentence, and the rights that he was waiving. He conceded guilt by admitting that he had a gun in his pocket and was ineligible to carry one.

As the trial court pointed out at the evidentiary hearing, all the factors that Petitioner is now complaining about were "known to him on the day that he made the plea [a]nd so it begins to look like buyer's remorse . . . ." 5/11/15 Post-Conviction Hr'g Tr. at 54-55. The fact that Petitioner may have preferred to plead guilty, knowing that his chances for an acquittal at trial were slight and that his

sentence might be longer following a trial, does not necessarily prove that his plea was coerced and involuntary. *Brady*, 397 U.S. 749-50.

## IV. Conclusion

Defense counsel satisfied *Strickland's* deferential standard, as well as the *Hill* standard, and the trial court's determination that defense counsel was not ineffective is entitled to deference under AEDPA because it was reasonable. The state appellate court's rejection of Petitioner's claim for lack of merit also was reasonable. Accordingly, the petition for a writ of habeas corpus is DENIED.

Petitioner has no automatic right to appeal the Court's denial of his petition; instead, he must first seek and obtain a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as in this case, "a district court has rejected the constitutional claim[] on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim[] debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists would not find the Court's assessment of Petitioner's constitutional claim debatable or wrong. Accordingly, the Court declines to issue a certificate of appealability. Petitioner may apply to the Court of

Appeals for a certificate of appealability.

IT IS SO ORDERED.


Dated:  February 11, 2019                    s/Paul D. Borman
                                             Paul D. Borman
                                             United States District Judge